IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

SHEILA H.,

            **Plaintiff,**

v.                                  Civil Action 1:22-cv-555
                                    Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF**
**SOCIAL SECURITY,**

            **Defendant.**

## OPINION AND ORDER

Plaintiff, Sheila H., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 9) and **AFFIRMS** the Commissioner's decision.

**I.      BACKGROUND**

Plaintiff filed her application for DIB on November 20, 2018, alleging disability beginning January 31, 2003. (R. at 212–18). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a video hearing on September 2, 2021. (R. at 25–63). The ALJ denied benefits in a written decision. (R. at 10–24). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on September 26, 2022 (Doc. 1), and the Commissioner filed the administrative record on November 18, 2022 (Doc. 6). The matter has been briefed and is ripe for consideration. (Docs. 9, 12, 13).

A. **Relevant Hearing Testimony**

The ALJ summarized the reports presented to the administration and testimony from Plaintiff's hearing:

> Initially, [Plaintiff] alleged disability due to Meniere's disease, oversensitive sense of smell, and bladder cancer, in remission (3E/2). At the hearing, [Plaintiff] testified that her dizziness started in 1999. She reported she had daily episodes before her surgery in 2003 and she felt better with fewer episodes from 6 to 12 months afterwards. [Plaintiff] stated that she had unpredictable, less severe attacks more than once a week, and sometimes she would have to crawl due to them. She added that her attacks last about 30 minutes. [Plaintiff] testified that she had severe attacks about once a month, and they would take her out for days (testimony).

(R. at 16).

B. **Relevant Medical Evidence:**

The ALJ summarized the medical records as follows:

> In December 2002, a few months before her alleged onset date, [Plaintiff] reported she had 2 to 3 episodes of vertigo in the previous 5 months, along with nausea, ear pressure, ear ringing, hearing loss, and ear itching. However, an audiogram showed normal hearing, and her exam was normal. She told to take [D]yazide and follow a low salt diet (4F/3). Around the alleged onset date in January 2003, [Plaintiff] stated she was doing better, with no vertigo but occasionally she felt lightheaded and had intermittent ear fullness and tinnitus. She said she only took Dyazide for two weeks because it made her sick to her stomach, though she was maintaining on low salt diet alone. Physical exam findings were normal (4F/5-6).

> In July 2003, [Plaintiff] reported no improvement with low salt diet or diuretic. Allergy testing was positive for significant dust allergy. [Plaintiff] elected for left endolymphatic mastoid shunt (1F/6). In November, she stated she had not had any vertigo since the shunt placement. She said she occasionally had ear fullness but was much improved overall (1F/3). In May 2004, [Plaintiff] reported she had been doing well until that month, reporting she had three episodes, possibly due to allergy season. She was restarted on allergy medication (1F/2).

> There is then a break in treatment for Meniere's disease for several years, though [Plaintiff]'s representative asserts [Plaintiff] did not undergo follow-up treatment because there is no cure for Meniere's disease (16E/2).

> In May 2007, [Plaintiff] had a cardiology visit. [Plaintiff] reported chest discomfort and palpitations. She said she was in "her usual state of health until three weeks ago" when she developed a sinus infection, then chest discomfort that was slightly

2

> more intense when she took a deep breath. Holter monitoring showed no significant abnormality, just rare PACs. [Plaintiff] reported she suddenly felt much better after two courses of antibiotics. She also stated she was a stay-at-home mom, with three kids under 20 and a 6-month-old grandchild. She added she was "extremely active" around the home. An EKG was normal, but she had a soft murmur on exam (2F/2-3, also 6F). The next month, there were no changes/evidence of ischemia with EKG or echo. She was noted with mild mitral and tricuspid valvular insufficiency (2F/4).

(R. at 17).

### C. The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement on March 31, 2007, and did not engage in substantial gainful employment during the period from her alleged onset date of January 31, 2003, through her date last insured. (R. at 15). The ALJ determined that Plaintiff had the impairments of Meniere's disease and orthostatic hypotension during the relevant period. (*Id.*). Still, the ALJ found that none of Plaintiff's impairments were severe and none of them met or medically equaled a listed impairment. (*Id.*).

Because the ALJ found no impairment to be severe, she was not required to move to the next steps of the analysis. But the ALJ made an alternative residual functional capacity ("RFC") finding:

> In the alternative and assuming *arguendo* that Meniere's disease was a severe impairment, [Plaintiff] would still have been able to perform a full range of exertional work except she would have been able to occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. She could also have had no exposure to unprotected heights, no use of dangerous machinery, and no commercial driving.

(R. at 18).

Relying on the vocational expert's testimony, the ALJ determined that, through the date last insured, considering her age, education, work experience, and RFC, Plaintiff could perform her past work of a sandwich maker and sales demonstrator. (*Id.*). She therefore concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from January

31, 2003, the alleged onset date, through March 31, 2007, the date last insured (20 CFR 404.1520(c))." (*Id.*).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III. DISCUSSION

In her Statement of Errors, Plaintiff argues that the ALJ erred at step three by failing to apply Listing 2.00(C). And, alternatively, Plaintiff argues that her symptoms rendered her unable to work so, says Plaintiff, the ALJ erred when crafting the RFC. For support, Plaintiff primarily relies on the opinion of her treating primary care physician, Mahboobullah Noory, M.D. (Docs. 9, 13).

4

Up front, the Undersigned notes Plaintiff has a hurdle to overcome before her assigned errors can be considered. The ALJ determined that Plaintiff had no severe impairments during the relevant period. A finding of non-severity at step two ends the analysis. The listing determination is made at step three of the sequential evaluation, and the residual functional capacity finding is made after that. As discussed below, the ALJ made an alternative finding at the end of the decision, but the threshold issue before the Court is whether the ALJ's finding of non-severity is supported by substantial evidence.

The Commissioner says it is. She argues that the ALJ properly determined at step two that Plaintiff was not disabled prior to her date last insured because she did not have a severe impairment. In the alternative, the Commissioner argues that Plaintiff could still perform her past relevant work and would be "not disabled" on that additional basis. (Doc. 12).

**A. Step Two**

At step two, an ALJ must determine whether a claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe." 20 C.F.R. § 404.1520(c). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 404.1522; Social Security Rulings (SSRs) 85-28 and 16-3p. If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled.

Here, the ALJ concluded that Plaintiff had impairments that were medically determinable, but the impairments did not rise to the level of severity required by the Social Security regulations.

5

The Social Security Act defines disability as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A); 20 C.F.R. § 404.1505. A claimant's symptoms alone are not enough, as the impairment must be established by appropriate medical findings. *See* 20 C.F.R. § 404.1521 (medically determinable impairments must be established by objective medical evidence from an acceptable medical source, symptoms alone insufficient); SSR 16-3p (symptoms alone are insufficient to establish the impairment as medically determinable).

Additionally, a claimant must show that the impairment was severe during the time she was insured for Title II disability benefits. *See Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990); *see also* 20 C.F.R. § 404.101(a). Here, the ALJ found that Plaintiff's insurance period ended on March 31, 2007. (R. at 15). Plaintiff does not dispute the insured status date, and Plaintiff thus must show that her impairment was severe between the alleged onset date, January 31, 2003, and the date last insured, March 31, 2007.

The ALJ found that Plaintiff's Meniere's disease and orthostatic hypotension were medically determinable impairments. (R. at 15). "Meniere's disease is a disorder of the inner ear that causes severe dizziness (vertigo), ringing in the ears (tinnitus), hearing loss, and a feeling of fullness or congestion in the ear. Meniere's disease usually affects only one ear." *What Is Ménière's Disease? — Diagnosis and Treatment*, NAT'L INST. OF HEALTH, NAT'L INST. ON DEAFNESS AND OTHER COMMC'N DISORDERS, https://www.nidcd.nih.gov/health/menieres-disease (last updated Feb. 13, 2017). The condition may come on suddenly, and some individuals have attacks that are closer together while other individuals have a single attack of dizziness separated by "long periods of time." *Id.*

While the ALJ acknowledged Plaintiff's impairments, she went on to say that they were not "severe" as that term is defined in agency regulations. (R. at 16–18). A severe impairment is an impairment that significantly limits an individual's ability to work. *See* 20 C.F.R. § 404.1520(c) ("[A] "severe impairment…significantly limits your physical or mental ability to do basic work activities…"); *see also* § 404.1522 (defining non-severe impairments).

A review of the record shows that there is substantial evidence to support the ALJ's determination. Notably, there are few medical records from the relevant time period. They include:

- January 2003: Plaintiff states she is "doing better with no vertigo" but has "occasional[] lightheadedness" and intermittent ear fullness; normal physical exam findings. (R. at 396–97).

- July 2003: Testing positive for "significant dust allergy," Plaintiff elects for left endolymphatic mastoid shunt surgery. (R. at 347).

- August 2003: Endolymphatic mastoid shunt surgery (no complications reported). (R. at 345–46).

- November 2003: Roughly 3 months after endolymphatic mastoid shunt surgery, Plaintiff reports no episodes of vertigo since surgery. (R. at 344).

- May 2004: Plaintiff reports doing well until that month. She reports three episodes, which she attributes to "allergy season." She is advised to resume allergy medication and a follow-up visit is scheduled for six months later. (R. at 343).

- June 2004–March 2007: No records.

To summarize, in early 2003, Plaintiff was having episodic vertigo, presumably due at least in part to Meniere's Disease. Ultimately, after diuretics and a low-sodium diet failed to relieve her symptoms, she chose endolymphatic mastoid shunt placement in her left ear. The surgery went well. Then, about three months later, Plaintiff reported doing well and that she had been "episode free." Roughly six months after that, she reports she had been episode-free until then. So, for about nine months (August 2003–May 2004), Plaintiff reports being episode-free and reports doing

7

well. And, when she reports not doing as well in May 2004, she attributes the change to allergy season. Her medical provider prescribes allergy medication and schedules a follow-up appointment for six months later. The record then goes silent through Plaintiff's last-insured date, March 15, 2007. So there are long periods of time when Plaintiff reported mild or no symptoms caused by Meniere's disease. On this record, the ALJ's determination that Plaintiff's Meniere's disease was not severe is supported by substantial evidence.

> Still more, the ALJ considered the next medical record in the file, dated May 2007:
>
> In May 2007, [Plaintiff] had a cardiology visit. [Plaintiff] reported chest discomfort and palpitations. She said she was in "her usual state of health until three weeks ago" when she developed a sinus infection, then chest discomfort that was slightly more intense when she took a deep breath. Holter monitoring showed no significant abnormality, just rare PACs. [Plaintiff] reported she suddenly felt much better after two courses of antibiotics. She also stated she was a stay-at-home mom, with three kids under 20 and a 6-month-old grandchild. She added she was "extremely active" around the home. An EKG was normal, but she had a soft murmur on exam (2F/2-3, also 6F). The next month, there were no changes/evidence of ischemia with EKG or echo. She was noted with mild mitral and tricuspid valvular insufficiency (2F/4).

(R. at 17). Although the record is beyond Plaintiff's last-insured date, it provides helpful context. *See Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 850 (6th Cir. 2020) (citations omitted) (affirming use of evidence of a claimant's medical condition after the expiration of a date last insured if it "illuminates that condition before the expiration of insured status"). Plaintiff reported being an "extremely active" stay-at-home parent who recently had been in her "usual state of health," which the cardiologist noted included "no significant past medical history." (R. at 349–50).

To challenge the ALJ's conclusion that her Meniere's disease was not severe during the relevant period, Plaintiff turns to a medical assessment her primary care provider, Mahboobullah Noory, M.D., submitted in March 2020. An ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence

8

showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(1)–(5). Supportability and consistency are the most important factors; and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2). Though an ALJ may discuss how he or she evaluated the other factors, it is not required. *Id*. If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same, [the ALJ will] articulate how [he or she] considered the other most persuasive factors . . . . . " 20 C.F.R. § 404.1520c(b)(3). Thus, the role of the ALJ is to articulate how he considered medical opinions and how persuasive he found the medical opinions to be. *Holston v. Saul*, No. 1:20-CV-1001, 2021 WL 1877173, at *11 (N.D. Ohio Apr. 20, 2021), *report and recommendation adopted*, No. 1:20 CV 1001, 2021 WL 1863256 (N.D. Ohio May 10, 2021).

> Here, the ALJ found Dr. Noory's opinion to be "not persuasive":
>
> In March 2020, …. [Dr. Noory] stated [Plaintiff] has been a patient for over 35 years. He then detailed her reported symptoms, frequency, and triggers. However, he did not cite any objective findings. Dr. Noory opined that she would be off task at least 25% of the time, she would need to take unscheduled breaks, and she would likely miss up to three days of work per month (10F). This opinion was not persuasive because it was rendered well past the date last insured (almost 3 years), and it is unclear how much, if any, of the limitations apply to the relevant period. In addition, the opinion is not consistent with other objective, contemporaneous evidence. For example, January 2003 examination findings were normal (4F/5-6). After a shunt placement in 2003, [Plaintiff] reported improvement. Though she noted having three episodes in May 2004, there is no objective evidence documenting limitations related to [Plaintiff]'s ability to work (1F/2-6).

(R. at 17–18).

The ALJ addressed supportability by noting that the doctor did not cite any objective findings. (*Id*.). *See* 20 C.F.R. § 404.1520c(c)(1) (defining supportability). The ALJ also considered that other evidence in the record was inconsistent with the opinions, such as

9

contemporaneous examination records and Plaintiff's overall treatment history. (R. at 18 (citing R. at 343–47 (UC Physicians examination records) and R. at 396–97 (Group Health Associates records showing doing better after surgery)). Thus, the ALJ considered the consistency factor. *See* 20 C.F.R. § 404.1520c(2) (defining consistency). Still more, the ALJ also noted that the opinion was written years after the date last insured, and it could not be ascertained whether the restrictions applied to the relevant period. (R. at 18). *See* 20 C.F.R. § 404.1520(c)(5) (other factors that tend to contradict the opinion). As such, the ALJ's evaluation is consistent with agency regulations and has record support.

In another effort to challenge the ALJ's analysis, Plaintiff says that the ALJ should have considered that her symptoms worsened in 2005 and remained heightened through the date last insured. (Doc. 11 at 9). But Plaintiff cites no evidence to support this narrative. And, as the ALJ noted, the record shows the opposite. (*See* R. at 17 (citing R. at 344 ("overall much improved"))). Moreover, the ALJ considered the 2004 treatment, despite it being attributed to allergies—a short-term condition that would not meet the 12-month duration requirement. (R. at 17, 69, 77, 257, 343). And, as mentioned above, the ALJ considered Plaintiff's heart-related treatment in May 2007, after the insured status expired at the end of March of that same year. (R. at 17, 349). Taking all those records into account, the ALJ explained that, from 2004 through the date last insured, there was little follow-up care or complaint, and there was a break in treatment for several years. (R. at 17).

Plaintiff also criticizes how the ALJ evaluated the state agency doctors' opinions. (*See* Doc. 9 at 11). A "prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review…" 20 C.F.R.

10

§ 404.1513(a)(5). An ALJ is not required to adopt the findings, but "will" consider the findings from these physicians. *Id.* at (b); *see also* SSR 17-2p. Similar to opinions from examining doctors, the findings are evaluated as provided for in 20 C.F.R. § 404.1520c—with an emphasis on supportability and consistency.

The ALJ found the prior administrative medical findings persuasive. (R. at 17 (citing R. at 64–71, 73–80)). Specifically, the ALJ found that the evidence cited by the agency doctors, including the successful shunt placement and the conservative and intermittent treatment supported a finding that the impairments were not severe. (R. at 17 (citing R. at 64–71, 73–80)). Accordingly, the ALJ followed the regulations, and her reliance on the state agency doctors was sound. *See Dyson v. Comm'r of Soc. Sec.*, 786 F. App'x 586, 590 (6th Cir. 2019) ("We regularly find that substantial evidence supports a no-disability determination when the ALJ relies primarily on independent medical advice consistent with the claimant's medical records.") (citing *Glasgow v. Comm'r of Soc. Sec.*, 690 F. App'x 385, 387 (6th Cir. 2017) (holding no-disability finding supported by substantial evidence where independent psychologists found that, though the claimant produced evidence of "work-preclusive limitations," he "could perform simple, repetitive tasks").

All told, substantial evidence supports the ALJ's conclusion that Plaintiff's Meniere's disease was not a severe impairment during the relevant period. On this basis alone, the Commissioner's decision is **AFFIRMED**.

### B. Step Three and Plaintiff's Residual Functional Capacity

Though a finding of non-severity at step two is fatal to Plaintiff's claim, the ALJ made an alternative finding at step three and went on to fashion an RFC, wherein Plaintiff could still work.

The Commissioner relies on these findings in the alternative, and Plaintiff focuses her argument here. Consequently, the Court addresses these matters briefly.

At step three, a claimant carries the burden to show that she has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, App. 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant meets all of the criteria of a listed impairment, she is disabled; otherwise, the evaluation proceeds to step four. 20 C.F.R. § 404.1520(d)–(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). Otherwise, "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (citations omitted). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record 'raise[s] a substantial question as to whether [the claimant] could qualify as disabled' under a listing, the ALJ should discuss that listing." *Id.* at 641 (quoting *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990)); *see also Reynolds*, 424 F. App'x at 415–16 (holding that the ALJ erred by not conducting any step three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641–42). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a Listing's criteria).

Relevant here, Listing 2.07 is defined as: "**Disturbance of labyrinthine-vestibular function** (Including Meniere's disease), characterized by a history of frequent attacks of balance disturbance, tinnitus, and progressive loss of hearing. With both A and B:

    A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and
    B. Hearing loss established by audiometry."

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.07.

The ALJ's addressed Listing 2.07:

[Plaintiff]'s representative also cited from case law relating to Meniere's disease and treating source statements (16E/3-4). However, these arguments are inapplicable to this case. For example, they cite to SSR 96-2p, which has been rescinded, and 20 CFR 404.1527, which applies to cases filed prior to March 27, 2017.

Further, [Plaintiff]'s representative argued listing 2.07 was met. However, this listing requires the following: A. Disturbed function of vestibular labyrinth demonstrated by caloric or other vestibular tests; and B. Hearing loss established by audiometry. There is no evidence of those requirements from the relevant period of adjudication (from the alleged onset date to the date last insured).

(R. at 18).

Plaintiff has offered no evidence to show that she satisfied Listing 2.07 and has not come close to "demonstrat[ing] that [she] reasonably could meet or equal every requirement of the listing." *Smith-Johnson*, 579 F. App'x at 432 (citing *Sullivan*, 493 U.S. at 530). Plaintiff seems to concede this (*see, e.g.*, Doc. 9 at 8), but criticizes the ALJ for not considering the introductory language to Listing 2.00(C)(2), which says that for Meniere's disease, "the severity of the impairment is best determined after prolonged observation." As an initial matter, the Court reads Listing 2.00(C)(2) as complementary to Listing 2.07—not as an alternative. Further, Listing 2.00(C)(2) cannot swallow the requirement that an impairment be severe during the insured period. But even putting those points aside, the record shows that Plaintiff was symptom-free or had limited symptoms for many years after her successful endolymphatic mastoid shunt surgery in her left ear. Again, Plaintiff relies exclusively on Dr. Noory's opinion to argue otherwise. Yet, Dr. Noory repeatedly reported that Plaintiff was not suffering from chronic medical problems for nearly a decade after her date last insured:

- November 15, 2010: "Ms. Hall has no significant chronic medical problems." (R. at 472).
- March 15, 2013: "Ms. Hall has no significant chronic medical problems." (R. at 491).
- November 19, 2013: "Ms. Hall has no significant chronic medical problems." (R. at 499).
- November 25, 2014: "Ms. Hall has no significant chronic medical problems." (R. at 515).
- April 15, 2016: "Ms. Hall has no significant chronic medical problems." (R. at 530).

These same records—as well as others—report Meniere's disease under "past medical history," but do not report active symptoms. (*See, e.g.*, R. at 500, 509). So there is evidence that, for considerable time after her date last insured, Meniere's disease was not affecting Plaintiff's quality of life or ability to function. Though there is some evidence that Plaintiff's Meniere's disease caused symptoms intermittently many years after the date last insured (*see, e.g.*, R. at 522,

14

551), that is not the question. Instead, the question is whether substantial evidence supports the ALJ's conclusion at step three. It does, and the ALJ did not err.

As for Plaintiff's residual functioning capacity, the ALJ found "[i]n the alternative and assuming arguendo that Meniere's disease was a severe impairment:

> [Plaintiff] would still have been able to perform a full range of exertional work except she would have been able to occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. She could also have had no exposure to unprotected heights, no use of dangerous machinery, and no commercial driving. At the hearing, the undersigned asked the vocational expert whether an individual with [Plaintiff]'s age (younger individual and closely approaching advanced age), education (limited education), vocational profile, and residual functional capacity could perform any of [Plaintiff]'s past work. The vocational expert testified that such an individual would be able to perform [Plaintiff]'s past work of sandwich maker (DOT 317.664-010, medium per DOT, light as actually performed, SVP 2) and sales demonstrator (DOT 279.357-038, light as actually and generally performed, SVP 3).

(R. at 18).

A claimant's RFC is an assessment of "the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A claimant's RFC assessment must be based on all the relevant evidence in his or her case file. *Id.*; *see also* 20 C.F.R. §§ 404.1513(a), 404.1520c. Substantial evidence supports that Plaintiff would not have needed additional work limitations due to her Meniere's disease. At most, Plaintiff experienced sporadic yet infrequent vertigo and dizziness during the relevant timeframe. The limitations crafted by the ALJ account for those symptoms, and Plaintiff has not offered record evidence to justify further limitations.

So, on this alterative basis too, the Commissioner's decision is **AFFIRMED**.

IV. **CONCLUSION**

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 9) is **OVERRULED**, the Commissioner's decision is **AFFIRMED**, and judgment is entered in favor of the Commissioner.

15

IT IS SO ORDERED.

Date: March 24, 2023 /s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE